UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

UNITED STATES ex rel. JDJ & ASSOCIATES
LLP, et al.,

                            Relator,                          15-cv-5427 (PKC)

         -against-                                       MEMORANDUM
                                                         AND ORDER

NATIXIS, et al.,

                            Defendants.
-----------------------------------------------------------x

CASTEL, Senior District Judge:

       JDJ & Associates LLP ("JDJ"), the qui tam relator, brings this action under the

False Claims Act, 31 U.S.C. § 3729, et seq. (the "FCA"), on behalf of the United States of

America.  JDJ contends that Natixis, its subsidiaries, and related entities (together, "Natixis") are

liable under the FCA because they sponsored and sold Residential Mortgage Backed Securities

("RMBS") to government-sponsored entities, including the Federal National Mortgage

Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie

Mac"), that under-reported the number of delinquent residential mortgage loans in the trusts

backing the RMBS.  JDJ also brings claims under state and municipal analogues to the FCA,

alleging that defendants sponsored and sold RMBS with similarly inadequate disclosures, backed

by the same trusts, to state and municipal pension funds.

       Defendants move to dismiss JDJ's complaint under Rules 12(b)(1) and 12(b)(6),

Fed. R. Civ. P., for lack of subject matter jurisdiction and failure to state a claim upon which

relief may be granted.  (Dkt. 49.)  The Court concludes that substantially similar allegations

regarding the mortgage loans underlying the RMBS at issue were publicly disclosed prior to this

action being filed, regardless of whether the pre- or post-2010 version of the FCA's public

disclosure bar is applied. Defendants' motion to dismiss relator's claims under the FCA will be granted. The Court declines to exercise supplemental jurisdiction over JDJ's state law claims, which will be dismissed without prejudice.

BACKGROUND

I.    <u>Overview of RMBS.</u>

The RMBS securitization process begins when an investment bank or other entity (the sponsor) takes title to a number of mortgage loans, either as the originator of those loans or after purchasing them from a seller. (Relator's Amended Complaint, Nov. 7, 2016, Dkt. 44 ("Complaint") ¶ 66.) The sponsor then sells a pool of mortgage loans to a depositor. (Complaint ¶ 66.) This transaction takes the form of an assignment and assumption agreement, also known as a mortgage loan purchase agreement, in which the sponsor makes certain representations and warranties. (Complaint ¶ 66.) Once the depositor takes title to the mortgage loans, the depositor conveys the loans, and assigns all right, title, and interest in the loans, to a separate RMBS trust pursuant to a pooling and servicing agreement. (Complaint ¶ 67.) The sponsor contracts with a loan servicer to administer the loans and collect information on them. (Complaint ¶ 67.)

The depositor and sponsor then act as the registrant/issuer of securities known as RMBS Certificates, which are backed by the pool assets in the trust. (Complaint ¶ 68.) As part of the registration process the Securities and Exchange Commission ("SEC") requires certain representations be made and other requirements met, including certain disclosures regarding the underlying mortgage loans. (Complaint ¶ 68.) Underwriters then purchase the RMBS Certificates at a discounted price and sell them to investors, establishing a market value. (Complaint ¶ 69.)

Having accurate information regarding the loans in the pool backing the RMBS is important for investors to properly evaluate the risk of the investment; a large factor in this assessment is the loan payment status of the mortgage loans, i.e., whether the borrowers are making payments on time. (Complaint ¶¶ 71-72.) Various laws and regulations impose requirements on the securitization of RMBS, including requirements related to the reporting of the percentage or aggregate value of mortgage loans in the trust that are delinquent as of the date they are placed in the trust, i.e., the date of the trust's creation (the "Cut-Off Date"). (Complaint ¶ 74.) SEC-promulgated Regulation AB ("Reg AB"), effective since 2006, sets a maximum limit on the proportion of loans in RMBS trusts that may be delinquent, and sets standards by which delinquency is to be determined. (Complaint ¶¶ 79-80, 95.)

The industry standard is to classify delinquency based on how many months past due a borrower is on payments. (Complaint ¶ 85.) While there are multiple acceptable measures for calculating delinquencies, the SEC requires that measurement be no more lenient in evaluating delinquency status, that is, no more favorable towards finding a loan to be not delinquent, than the calculation method used by the Office of Thrift Supervision ("OTS"). (Complaint ¶¶ 86-88.)

II.     JDJ's Allegations.

JDJ alleges that Natixis sold mortgage-backed securities to government-sponsored entities and state and municipal pension funds in 2006 and 2007 that did not comply with applicable disclosure requirements. (Complaint ¶¶ 7, 8, 40, 58, 61.) Specifically, JDJ alleges that Natixis improperly used a standard for assessing the delinquency of loans in seven RMBS trusts that was more lenient than the OTS method, manipulating the data to shift the underlying loans to the next most favorable delinquency tier. (Complaint ¶¶ 8, 92.) Regulations require

delinquency rates to be reported as of the Cut-Off Date for the trust, as well as in monthly remittance reports, which are required to use the same methodology. (Complaint ¶¶ 92, 99.)

To summarize, JDJ alleges that:

By ignoring Reg AB when reporting the Cut-Off Date delinquencies, [defendants] hid or caused to be hidden the instability of the loans in the pools they sought to securitize. Under their methodology, rather than a loan becoming "delinquent" (and specifically, "30 days delinquent") when the second consecutive payment is missed, a loan was not considered "30 days delinquent" until the borrower missed the second subsequent payment after an initial missed payment—i.e., the third missed payment). In other words, [defendants] deceptively shifted all delinquent loans up to the next more favorable tier. Although Issuers sometimes varied in the descriptions of their methodology and how they presented the data, the descriptions were false and misleading smokescreens masking the fact the Issuer was actually ignoring Reg AB.

(Complaint ¶ 103 (emphasis omitted).)

By using methodologies for reporting delinquencies other than those approved by the SEC or the trusts' stated delinquency methodologies, defendants:

[R]eported loan delinquencies "as of" the day prior to the Cut-Off Date which, because both the Cut-Off Date and the loan payment due date were the first of the month for almost all loans, resulted in underreporting the Trusts' actual 30-day delinquency percentages at a level that would allow them to securitize unworthy pools and make the associated securities attractive to unwary investors . . . .

(Complaint ¶ 115.) Defendants further hid delinquencies by using the same improper standards for calculating delinquency in disclosures associated with monthly remittance reports as well as by back-dating late payments. (Complaint ¶ 102.)

JDJ alleges that Natixis made or caused to be made various false statements with respect to the reporting of delinquency data, or falsely represented that certain information was accurate, including in the underwriting agreements, (Complaint ¶ 105), at least one Form 10-K for each trust, (Complaint ¶ 106), the pooling servicing agreements, (Complaint ¶ 107), and the

monthly remittance reports, (Complaint ¶ 111).  JDJ alleges that through these

misrepresentations Natixis induced government-sponsored entities such as Fannie Mae and

Freddie Mac to purchase RMBS Certificates at significantly higher prices than the Certificates

were worth and caused the government-sponsored entities to remain unaware of the true value of

the Certificates.  (Complaint ¶ 113.)  Ultimately, defendants allegedly disclosed only a small

percentage of the loans that were delinquent in the trusts, either as of the Cut-Off Date or in the

monthly remittance reports.  (Complaint ¶ 118.)

LEGAL STANDARD

   "A case is properly dismissed for lack of subject matter jurisdiction under Rule

12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."

Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  As the party asserting jurisdiction,

the plaintiff bears the burden of demonstrating subject matter jurisdiction.  See Amidax Trading

Grp. v. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d Cir. 2011).  In resolving a motion to dismiss

under Rule 12(b)(1), "the district court must take all uncontroverted facts in the complaint . . . as

true, and draw all reasonable inferences in favor of the party asserting jurisdiction."  Tandon v.

Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014).  "But where

jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues

of fact by reference to evidence outside the pleadings, such as affidavits."  Id. (alterations and

internal quotation marks omitted); see also Ray Legal Consulting Grp. v. Gray, 37 F. Supp. 3d

689, 696 (S.D.N.Y. 2014) ("[W]here subject matter jurisdiction is contested[,] a district court is

permitted to consider evidence outside the pleadings, such as affidavits and exhibits.").

   Rule 12(b)(6) requires a complaint to "contain sufficient factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662,

678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). In assessing the sufficiency of a complaint, a court must disregard legal conclusions, which are not entitled to the presumption of truth. <u>Id.</u> Instead, the Court must examine the well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." <u>Id.</u> at 679. "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the [relator]'s claims are barred as a matter of law.'" <u>Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE</u>, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting <u>Conopco, Inc. v. Roll Int'l</u>, 231 F.3d 82, 86 (2d Cir. 2000)).

In analyzing a motion to dismiss pursuant to Rule 12(b)(6), consideration is generally limited to the factual allegations in the complaint. Rule 12(d), Fed. R. Civ. P. A court, however, may also consider certain documents such as those incorporated by reference or attached to the complaint as exhibits and items of which judicial notice may be taken. <u>See</u> <u>Samuels v. Air Transp. Local 504</u>, 992 F.2d 12, 15 (2d Cir. 1993). Additionally, a court may consider a document "where the complaint relies heavily upon its terms and effect, [thus] render[ing] the document integral to the complaint." <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted).

DISCUSSION

I.     <u>Overview of the FCA.</u>

The FCA provides that "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . is liable to the United States Government . . . ." 31 U.S.C. § 3729(a)(1)(A). It also provides that "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable to the United States Government . . . ." 31 U.S.C. §

3729(a)(1)(B). To state a claim for relief under the FCA, a relator must allege with particularity that a defendant "(1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." Bishop v. Wells Fargo & Co., 823 F.3d 35, 43 (2d Cir. 2016) vacated on other grounds by Bishop v. Wells Fargo & Co., 137 S. Ct. 1067 (2017).

"The FCA was enacted in 1863 to combat fraud by defense contractors during the Civil War. Consistent with its origin, the archetypal FCA claim involves a factually false request for payment from the government, as when a contractor delivers a box of sawdust to the military but bills for a shipment of guns." Bishop, 823 F.3d at 43 (internal citation omitted). In addition to express factual falsehoods, a defendant may be liable for "legally false" claims that falsely certify compliance with a regulation or a statute containing a material condition for government payment. Id.; Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989, 1999 (2016)

However, "[t]he False Claims Act is not an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations." Id. at 2003 (internal citation and quotation marks omitted); Bishop, 823 F.3d at 39 ("the FCA was not designed to reach every kind of fraud practiced on the Government") (internal quotation marks omitted). A complaint must "plausibly connect[ ]" the defendant's alleged fraud to "claims submitted to the government for payment." Id.

II.     The Public Disclosure Bar.

        a.   Section 3730(e)(4)(A) and the 2010 Amendment to the FCA.

The FCA's public disclosure bar, Section 3730(e)(4)(A), forecloses private parties from bringing "qui tam suits when the relevant information has already entered the public domain through certain channels." Graham Cty. Soil & Water Conservation Dist. v. United

States ex rel. Wilson, 559 U.S. 280, 285 (2010).  This section of the FCA was amended by the

Patient Protection and Affordable Care Act ("PPACA"), effective March 23, 2010.  See Pub. L.

111-148, § 10104(j)(2), 124 Stat. 119 (Mar. 23, 2010).  However, the "principle that the legal

effect of conduct should ordinarily be assessed under the law that existed when the conduct took

place has timeless and universal appeal."  Hughes Aircraft Co. v. United States ex rel. Schumer,

520 U.S. 939, 946, 951-52 (1997) (presumption against retroactivity applied to amendment to the

FCA's public disclosure bar where retroactive application would serve to deprive defendant of a

defense); see also Graham Cty. Soil & Water Conservation Dist., 559 U.S. at 283 n.1 (2010

amendment to FCA public disclosure bar would serve to deprive defendant of a defense and thus

did not have retroactive effect).  Both parties agree that the language of the public disclosure bar

as it existed in 2006-07, when the RMBS with allegedly inadequate and misleading disclosures

were sold, is applicable in this case.  (Defs.' Mem. in Supp., Jan. 6, 2017, Dkt. 50 at 5-6 & n.3;

Relator's Mem. in Opp., Feb. 3, 2017, Dkt. 59 at 3-4.)

        However, in the present action, while the allegedly improper sales of the RMBS

took place before the 2010 amendment to the FCA, the public disclosures that Natixis argues

trigger the public disclosure bar took place after the amendment.  It is thus not clear that the

appropriate analysis rests on the pre-2010 version of the FCA as the parties contend.  See

Hughes Aircraft Co., 520 U.S. at 946 n.4. ("Because both the allegedly false claim submission

and the disclosure to the Government of information about that submission occurred prior to the

effective date of the 1986 amendments, we need not address which of these two events

constitutes the relevant conduct for purposes of our retroactivity analysis.").[1]  However, because

---

[1] Other Circuits have held that it is the version of the public disclosure bar that was in force at the time of the allegedly false claim, rather than at the time of the public disclosure, that controls.  U.S. ex rel. Cantekin v. University of Pittsburgh, 192 F.3d 402, 411 (3d Cir. 1999) ("we conclude that we should use the date the claim was

the public disclosure bar forecloses JDJ's claims regardless of which version applies, the Court need not resolve this question.

The current language of the FCA provides that "[t]he court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" by certain enumerated sources. 31 U.S.C. § 3730(e)(4)(A). These sources include disclosures "(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media . . . ." Id. If such allegations or transactions have been so disclosed, then the action must be dismissed "unless . . . the person bringing the action is an original source of the information." Id. The current statute defines "original source," as an individual who either (i) "prior to a public disclosure . . . has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based," or (ii) "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B).

The FCA as it existed in 2006-07, when the RMBS with allegedly inadequate and misleading disclosures were sold to government-sponsored entities, provided that:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is

---

submitted for determining the retroactivity of the Grassley Amendment's 'public disclosure' bar to <u>qui tam</u> suits"); <u>U.S. ex rel. Lujan v. Hughes Aircraft Co.</u>, 162 F.3d 1027, 1031 (9th Cir. 1998) ("We conclude that the crucial event for purposes of non-retroactivity is the alleged presentation by Hughes of a false claim, and not the public disclosure of that conduct.")

> brought by the Attorney General or the person bringing the action is
> an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (1994). "A majority of circuit courts, including the Second Circuit,

adopted the view that 'based upon' meant that a relator's allegations would be barred if they

were 'substantially similar to' pre-complaint public disclosures." Ping Chen v. EMSL

Analytical, Inc., 966 F. Supp. 2d 282, 297 n.11 (S.D.N.Y. 2013) (citing United States ex rel. Doe

v. John Doe Corp., 960 F.2d 318, 324 (2d Cir. 1992); Glaser v. Wound Care Consultants, Inc.,

570 F.3d 907, 915 (7th Cir. 2009)). This version of the FCA defined "original source," as "an

individual who has direct and independent knowledge of the information on which the

allegations are based and has voluntarily provided the information to the Government before

filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B)

(1994).

> As now Chief Judge McMahon of this Court explained:
>
> Under both the pre- and post-PPACA versions of Section
> 3730(e)(4)(A), there is a two-prong test for determining whether the
> public disclosure bar applies: (1) whether the allegations in the
> complaint are "substantially similar" to allegations contained in
> prior "public disclosures," and, if so, (2) whether the suit may
> nonetheless go forward because the relator is an "original source" of
> the information underlying his allegations of fraud. . . . The 2010
> amendment altered the statutory language to adopt the courts'
> interpretation of the phrase "based on" as meaning "substantially
> similar." Leveski v. ITT Educ. Servs., Inc., 719 F.3d 818, 828 n.1
> (7th Cir. 2013). . . . Thus, under both the pre- and post-2010
> versions of the statute, courts assess whether the allegations in a qui
> tam complaint are "substantially the same" as or "substantially
> similar" to the allegations of fraud contained in the public
> disclosures in question. Ping Chen, 966 F. Supp. 2d at 297-98 &
> n.11.

United States ex rel. Kester v. Novartis Pharms. Corp., 43 F. Supp. 3d 332, 346 (S.D.N.Y. 2014).

Thus, while the amendment did not alter the "substantially similar" standard by which courts

analyze public disclosures, it did withdraw from triggering the public disclosure bar allegations disclosed in state court lawsuits, or federal lawsuits in which the federal government is not a party.

Before section 3730(e)(4)(A) was amended in 2010, the FCA explicitly denied jurisdiction over actions that did not pass the public disclosure bar. However, post-amendment, the public disclosure bar is no longer jurisdictional. United States ex rel. Chorches v. Am. Med. Response, Inc., 865 F.3d 71, 80 (2d Cir. 2017). Because JDJ's claims do not pass the public disclosure bar under either version of the FCA, its complaint will be dismissed, whether under Rule 12(b)(1) or (6).

### b. The "Substantially Similar" Test.

The FCA bars "'parasitic lawsuits' based upon publicly disclosed information in which would-be relators 'seek remuneration although they contributed nothing to the exposure of the fraud.'" United States ex rel. Kreindler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1157 (2d Cir. 1993) (citing United States ex rel. John Doe, 960 F.2d at 319). The public disclosure bar was "designed to preclude qui tam suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator." Id. at 1158. Section 3730(e)(4)(A) acts to bar not only qui tam actions "based 'solely' upon publicly disclosed information," but also actions "'based in any part upon publicly disclosed allegations or transactions.'" Id. (citing United States ex rel. Precision Co. v. Koch Indus., 971 F.2d 548, 552-53 (10th Cir. 1992)). The public disclosure bar applies where the publicly-available information "could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing." United States ex rel. Springfield Terminal Ry. v. Quinn, 14 F.3d 645, 654 (D.C.

Cir. 1994) (quoting <u>United States ex rel. Joseph v. Cannon</u>, 642 F.2d 1373, 1377 (D.C. Cir. 1981)).

In <u>United States ex rel. Kreindler & Kreindler</u>, the Second Circuit found that a relator's having obtained pertinent information through independent investigation, as well as from examining publicly-disclosed material (documents obtained through discovery in separate civil litigation), did not save his suit from the public disclosure bar. 985 F.2d at 1158-59. Similarly, the relator in <u>United States ex rel. Alcohol Found., Inc. v. Kalmanovitz Charitable Found., Inc.</u>, having gathered information from articles published by third parties, argued that it had obtained a unique "'perspective' . . . by spending hundreds of hours compiling facts into a 'mosaic.'" 186 F. Supp. 2d 458, 461 (S.D.N.Y. 2002). The relator argued that the sources of the publicly-disclosed information were "too technical for the average member of the public to understand," and it thus had "direct and independent information based on its creation of the 'mosaic' of information that shows a fraud on the United States," because "an average member of the public could neither understand the information available in the news media nor perceive a fraud absent [relator]'s compilation." <u>Id.</u> at 463. The district court rejected these contentions, finding that the action was based on publicly-disclosed information and that the relator was not an independent source of that information. <u>Id.</u>

As the Second Circuit stated in <u>United States ex rel. Kreindler & Kreindler</u>:

> Nor does the fact that [relator]'s background knowledge enabled it to understand the significance of the information acquired in the [separate civil] action make its knowledge independent of the publicly disclosed information. If that "were enough to qualify the relator as an 'original source,' then a cryptographer who translated a ciphered document in a public court record would be an 'original source,' an unlikely interpretation of the phrase."

985 F.2d at 1159 (quoting United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1160 (3d Cir. 1991)).

Other circuits are in agreement with this analysis, having found that claims based upon information gleaned from a relator's specialized or technical knowledge or expertise, which allowed it to understand or analyze publicly available data in ways that the general public could not, neither qualified the relator as an independent source of that information nor satisfied the requirement that substantially similar allegations not have been previously publicly disclosed. See United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A., 944 F.2d at 1160 ("[T]he relator must possess substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation."); United States ex rel. Springfield Terminal Ry., 14 F.3d at 655 (public disclosure bar applies where publicly-disclosed information is "in a form not accessible to most people" or "not readily comprehensible to nonexperts").

III.     The Public Disclosure Bar Forecloses JDJ's Claims.

    a.    Substantially Similar Allegations have been Publicly Disclosed.

        i.    Morgan Stanley's Connection with the RMBS at Issue.

By the close of the last decade, it was common knowledge that the financial crisis, and the recession which followed, were caused, at least in part, by various entities' investment in RMBS that were priced significantly above their true value.  It was likewise publicly known that some financial institutions had downplayed or otherwise obscured the risk such investments entailed, in some circumstances through affirmatively misstating the number of underlying loans that were delinquent or through opaque accounting practices that similarly deflated the number of delinquent loans that were reported.  However, public knowledge that the financial industry

generally engaged in such practices is not sufficient to defeat a qui tam action under the FCA. See U.S. ex rel. Jamison v. McKesson Corp., 649 F.3d 322, 331-32 (5th Cir. 2011). The Court must determine whether information was publicly available that indicated Natixis had sold RMBS with inadequate and misleading disclosures to government-sponsored entities.

Morgan Stanley and Co., LLC (f/k/a Morgan Stanley and Co. Incorporated) served as a co-underwriter with Natixis for each of the RMBS at issue in this case. (Complaint ¶ 8.) Morgan Stanley ABS Capital I Inc. served as the depositor for all seven trusts. (Complaint ¶ 8.) Morgan Stanley Mortgage Capital Inc. was a co-sponsor for two of the seven trusts. (Complaint ¶ 8.) Natixis served as the sponsor or co-sponsor of each trust. (Complaint ¶ 8.) The complaint does not allege that Natixis acted separately or in any way differently with respect to these securities than the Morgan Stanley-affiliated entities.

JDJ's original complaint included claims against Morgan Stanley as well as each of the three Morgan Stanley-affiliated entities (the "Morgan Stanley Defendants"). As detailed below, the government, and the world, was well aware that many RMBS associated with Morgan Stanley generally, and these three entities specifically, were sold for substantially higher prices than the value of the underlying mortgage loans warranted. Perhaps realizing this, JDJ amended its complaint in this action to withdraw claims against the Morgan Stanley Defendants. (Dkt. 44.)

JDJ cannot escape the public disclosure bar by repackaging a publicly-known claim against Morgan Stanley as a newly-uncovered claim against Natixis, who acted as Morgan Stanley's co-underwriter on the securitization of the identical pool of loans. There is no allegation that Naxitis' role as co-underwriter was hidden from public view. If Morgan Stanley failed to disclose or falsely disclosed material information, then so too did Natixis. The cat was

out of the bag as to RMBS underwritten or co-underwritten by Morgan Stanley.  Because substantially similar allegations were publicly disclosed before this action commenced, JDJ's claims are barred.

ii.    <u>Sources of Substantially Similar Allegations.</u>

Three years and one month before JDJ filed this lawsuit, the Federal Housing Finance Agency ("FHFA"), as Conservator for Fannie Mae and Freddie Mac, brought a lawsuit against Morgan Stanley and others alleging that the defendants had, with respect to RMBS sold to Fannie Mae and Freddie Mac, "falsely represented that the mortgage loans underlying the RMBS complied with certain underwriting guidelines and standards, and presented a false picture of the characteristics and riskiness of those loans."  (Am. Compl., <u>Fed. Hous. Fin. Agency v. Morgan Stanley</u>, 11 cv 6739 (DLC) (S.D.N.Y. June 13, 2012), Dkt. 80 at ¶ 1.)  Thirty out of the thirty-three RMBS in that case were underwritten by Morgan Stanley & Co., Inc.  (<u>Id.</u> at ¶ 15.)  Morgan Stanley ABS Capital I, Inc. was the depositor for fifteen of the thirty-three securitizations at issue in that case.  (<u>Id.</u> at ¶ 16.)  Morgan Stanley Mortgage Capital, Inc., and its successor in interest, Morgan Stanley Mortgage Capital Holdings LLC d/b/a Morgan Stanley Mortgage Capital, Inc., sponsored twenty-two of the thirty-three securitizations.  (<u>Id.</u> at ¶ 18.)

The Amended Complaint in that case alleged that "Fannie Mae and Freddie Mac would not have purchased these Certificates but for Defendants' material misrepresentations and omissions concerning the mortgage loans underlying the RMBS."  (<u>Id.</u> at ¶ 11.)  A court within this district has held that a prior lawsuit by FHFA against entities that served as underwriters, sponsors, and depositors for certain RMBS, alleging that false and misleading disclosures were made in connection with the RMBS, was sufficient to invoke the public disclosure bar against a subsequent <u>qui</u> <u>tam</u> action alleging that false and misleading disclosures were made in

connection with different RMBS with the same underwriters, sponsors, and depositors.  <u>United States ex rel. Amico v. Deutsche Bank AG</u>, No. 15 cv 9551 (CM), 2017 U.S. Dist. LEXIS 71548, at *13 (S.D.N.Y. May 8, 2017) ("That the Government, in the person of the FHFA, had already sued these very Defendants for their RMBS-related misconduct is dispositive of the question in and of itself.")

Three years before JDJ commenced this action, the SEC conducted investigations into Morgan Stanley regarding its "misleading public disclosures regarding the number of delinquent loans in two subprime [RMBS] transactions offered in 2007."  <u>In the Matter of Morgan Stanley and Co., LLC, et. al.</u>, Order Instituting Cease-and-Desist Proceedings pursuant to Section 8A of the Securities Act of 1933, Making Findings, and Imposing a Cease-and-Desist Order, July 24, 2014, Release No. 9617 at 2.  In that case, which Morgan Stanley settled without admitting wrongdoing, the SEC found that Morgan Stanley had misrepresented the proportion of delinquent loans in the two trusts underlying the RMBS—sponsored by Morgan Stanley Mortgage Capital Holdings, LLC, underwritten by Morgan Stanley & Co, LLC, and for which Morgan Stanley ABS Capital I, Inc. acted as the depositor—using methods similar to those JDJ alleges were used with respect to the RMBS at issue in this case.  <u>Id.</u> at 2-3.

Prior to the filing of the present action by JDJ, the National Credit Union Administration, an independent agency of the federal government, brought lawsuits in federal court making similar allegations regarding misreported delinquency rates in the trusts underlying RMBS affiliated with Morgan Stanley and related entities, including certain trusts backing the RMBS that are at issue in this action.  (Compl., <u>Nat'l Credit Union Admin. Bd. v. Morgan Stanley & Co., Inc.</u>, 13 cv 6705 (DLC) (S.D.N.Y. Sept. 23, 2013), Dkt. 1 at ¶¶ 55-61) (allegations include Natixis Real Estate Capital Trust 2007-HE2 and Morgan Stanley IXIS Real

Estate Capital Trust 2006-1); (First Am. Compl., <u>Nat'l Credit Union Admin. Bd. v. Morgan</u>

<u>Stanley & Co., Inc.</u>, 13 cv 2418 (JWL) (JPO) (D. Kan. Nov. 17, 2014), Dkt. 138 at ¶¶ 56-68.)

Before JDJ filed this lawsuit, numerous lawsuits had already been brought in state

court against Natixis and Morgan Stanley, alleging RMBS-related misconduct, including with

respect to certain trusts backing the RMBS that are at issue in this action. (Compl., <u>Cambridge</u>

<u>Place Inv. Mgmt. Inc. v. Morgan Stanley & Co., Inc.</u>, 10-2741 (Mass. Sup. Ct. July 9, 2010) at

¶¶ 1-2; Compl., <u>IXIS Real Estate Capital Trust 2007-HE1 v. Natixis Real Estate Holdings, LLC</u>,

652087/2014 (N.Y. Sup. Ct. July 8, 2014) at ¶¶ 1-6, 55-60 (alleging misrepresentations

concerning payment delinquencies of loans Natixis sold to IXIS Real Estate Capital Trust 2007-

HE1); Compl., <u>Natixis Real Estate Capital Trust 2007-HE2 v. Natixis Real Estate Holdings,</u>

<u>LLC</u>, 153945/2013 (N.Y. Sup. Ct. Oct. 4, 2013) at ¶¶ 1, 29-33 (alleging misrepresentations

regarding the quality of the loans that Natixis sold to NATIXIS Real Estate Capital Trust 2007-

HE-2); Compl., <u>HSH Nordbank AG v. Morgan Stanley</u>, 652988/2012 (N.Y. Sup. Ct. Jan. 31,

2013), at ¶¶ 1-4, 42 (alleging that Natixis and Morgan Stanley knowingly misrepresented the

quality of the loans in trusts backing certain RMBS, including loans in IXIS Real Estate Capital

Trust 2006-HE1, IXIS Real Estate Capital Trust 2006-HE2, and Morgan Stanley IXIS Real

Estate Capital Trust 2006-1)).

As described above, prior to the filing of this action by JDJ, substantially similar

allegations were publicly disclosed in state lawsuits and federal lawsuits in which an independent

agency of the federal government was a party. This would trigger the public disclosure bar as it

existed before the 2010 amendment. However, such disclosures do not trigger the public

disclosure bar under the FCA's current language.[2]  But the SEC action and the FHFA action, both of which make substantially similar allegations to, and were filed before, JDJ's action, are themselves sufficient to invoke the public disclosure bar under either version of the statute.

JDJ acknowledges that allegations against Natixis and Morgan Stanley regarding misconduct with respect to RMBS have been previously raised in civil suits, and against Morgan Stanley in SEC enforcement actions, but argues that the allegations in those cases related to misrepresentations made regarding the quality of the loans underlying the RMBS as opposed to misrepresentations regarding the way delinquency rates were calculated, which JDJ claims to raise for the first time in this action.  (Relator's Mem. in Opp., Feb. 3, 2017, Dkt. 59 at 7.) Where the previous allegations do address loan delinquency rates, JDJ argues, those allegations implicate different schemes than the specific scheme alleged in its complaint, or different trusts. (Id. at 7-8.)

The allegedly false claims underlying JDJ's lawsuit are Natixis' receipt of payment from the sale of RMBS to government entities.  These claims were allegedly false because the delinquency rates in the trusts backing the RMBS were higher than disclosed, and the RMBS were thus less valuable than they were purported to be.  Thus, the relevant allegation for the "substantially similar" analysis is that Natixis sold RMBS with allegedly inadequate and misleading disclosures to government-sponsored entities.  While the detection of precisely how the disclosures concerning the RMBS at issue were inadequate and misleading (underreporting delinquency rates) and how Natixis allegedly perpetrated the scheme (using a non-standard method to measure delinquency) could be helpful to determine that defendant had sold RMBS

---

[2] While disclosure through a federal civil lawsuit to which an independent agency of the federal government was a party would trigger the public disclosure bar under the pre-2010 version of the FCA, it is not clear what effect such disclosure would have after the 2010 amendment.

with allegedly inadequate and misleading disclosures to government-sponsored entities (the allegedly false claim), it is the fact that Natixis sold these RMBS to government-sponsored entities, in and of itself, that is the subject of the analysis.

While JDJ may have been the first to quantify the exact delinquency rates of mortgage loans in the RMBS trusts at issue and uncover the precise nature of defendants' scheme to disguise the true delinquency rates through non-standard measurement and reporting practices (assuming defendants did engage in such behavior), allegations that RMBS purchased by government-sponsored entities that were underwritten by Morgan Stanley & Co., Inc., and for which Morgan Stanley ABS Capital I, Inc. served as depositor, were already public, and that is the critical factor.

JDJ attempts to slice the onion way too thin. JDJ acknowledges the "specificity" of its allegations, conceding that the information which it argues was "not previously disclosed" consists of "identifying a specific scheme involving a particularized form of loan delinquency underreporting." (Relator's Mem. in Opp., Feb. 3, 2017, Dkt. 59 at 6.) JDJ does not, and cannot, argue that allegations regarding the inadequacy of the disclosures related to the RMBS trusts at issue in this case were undisclosed to the public. Rather, JDJ argues that its allegation "involves a different scheme than those in the cases against Natixis and Morgan Stanley and the government actions. Fraud issues in those cases specifically addressed misrepresentation as to loan quality, as the lenders failed to disclose pertinent information about the loans to investors. This case deals with an entirely different matter." (Id. at 7.) But, in fact, it does not deal with "an entirely different matter." (Id.) Loan quality and delinquency rates correlate. Loans of low or deficient quality would be expected to have a higher delinquency rate.

The government was on notice that the RMBS sold to government-sponsored entities by Natixis could very well have inadequate and misleading disclosures. The FCA's public disclosure bar does not require that every conceivable detail about a scheme to defraud the government be publicly known before it becomes applicable; neither does it require prior disclosure of each way in which a defendant has presented a false claim to the government. Rather, it is enough that the publicly-disclosed RMBS fraud "alerted law-enforcement authorities to the likelihood of wrongdoing." United States ex rel. Springfield Terminal Ry., 14 F.3d at 654 (quoting United States ex rel. Joseph, 642 F.2d at 1377).

      b.   JDJ is not an Original Source of the Publicly Disclosed Allegations.

JDJ is not an "original source" under the FCA. It possesses no knowledge that is "independent of and materially adds to," or "direct and independent" of, the "publicly disclosed allegations." 31 U.S.C. § 3730(e)(4)(B); 31 U.S.C. § 3730(e)(4)(B) (1994). Nor did JDJ "disclose[] to the Government the information on which allegations or transactions in [its] claim are based" before the public disclosures. 31 U.S.C. § 3730(e)(4)(B).

"The paradigmatic 'original source' is a whistleblowing insider." United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A., 944 F.2d at 1161. JDJ is not a traditional whistleblower. It is undisputed that neither JDJ, nor its members, ever had any business relationship with Natixis through which they gained insider information regarding Natixis' alleged fraudulent actions. Instead, JDJ argues that it qualifies as an independent source under the FCA because it conducted a "proprietary analysis" of information obtained from sources that were both public and non-public. However, JDJ's analysis appears to be based entirely upon public documents: underwriting agreements (Complaint ¶ 105), public documents filed with the SEC such as form 10-Ks and 8-K disclosures, (Complaint ¶¶ 106, 171), pooling servicing

agreements, (Complaint ¶ 107), monthly remittance reports, (Complaint ¶ 111), and loan data accessible online, (Complaint at ¶ 159), among other publicly-available documents.

JDJ argues that it "developed direct and independent knowledge through approximately a year of forensic analytic work" analyzing "transaction documents" and "raw loan payment data not publicly disseminated." (Relators' Mem. in Opp., Feb. 3, 2017, Dkt. 59 at 8.) However, JDJ's complaint explicitly states that the "loan level data . . . was published at the trustee's website." (Complaint at ¶ 159.) The complaint further states that "some of the time zero mortgage loan schedules" were filed with the SEC in "free writing" prospectuses or 8-K disclosures "as high-megabyte text files nearly indecipherable" to government-sponsored entities. (Complaint at ¶ 171 (emphasis omitted).) Notably, JDJ does not refer to a single specific document or source of information that was not public, nor any data used in its analysis that came from non-public sources.

Next, JDJ argues that even if the data upon which it relied was publicly available, "the information used by Relator was virtually inaccessible publicly and even once accessed was presented in a format which made it indecipherable to the general public, and therefore was insufficient to constitute a public disclosure of the fraud alleged." (Complaint ¶ 49.) The complaint asserts that JDJ undertook a "painstaking technical process," working with data files so large that a conventional PC in 2006-07 would not have been able to manipulate them. (Complaint at ¶¶ 172-74.) But as described above, a relator must bring more than expertise or a novel analysis to the table in order to avoid the public disclosure bar.

Finally, JDJ argues that its discovery of defendants' wrongdoing was not based on public filings, but rather that the public filings were merely evidence that corroborated JDJ's already existing suspicions. (Relators' Mem. in Opp., Feb. 3, 2017, Dkt. 59 at 4.) But JDJ fails

to identify anything that aroused these alleged suspicions other than information that was publicly available.  JDJ gives no indication that it had any suspicions whatsoever regarding the alleged wrongdoing prior to examining publicly available information, and points to no data upon which its analysis relied that was not drawn from publicly available sources.  Instead, JDJ asserts that it is its analytical methodology, applied to the publicly available information, that constitutes original information.

Just as combining publicly available information with specialized expertise is not sufficient to overcome the first step of the public disclosure bar, neither does conducting an analysis based on such expertise qualify a relator as an original source.  See United States ex rel. Kreindler & Kreindler, 985 F.2d at 1159; United States ex rel. Rosner v. WB/Stellar IP Owner, L.L.C., 739 F. Supp. 2d 396, 408 (S.D.N.Y. 2010) (relator who obtained information "through his own investigative efforts" by interviewing third parties and searching a public database did not qualify as an original source); United States ex rel. Alcohol Found., 186 F. Supp. 2d at 463 ("The Court does not find . . . that Alcohol Foundation's recitation of various facts and figures related to the marketing, consumption and regulation of alcoholic beverages transforms Alcohol Foundation into an 'original source.'")

Because the allegations in JDJ's complaint fail to pass the public disclosure bar as it existed either before the 2010 amendment, when the sales of the RMBS with allegedly inadequate and misleading disclosures took place, or after the amendment, when the alleged wrongdoing was first publicly disclosed, JDJ's FCA claims will be dismissed under either Rule 12(b)(1) or 12(b)(6), Fed. R. Civ. P.

IV.    State Law Claims.

JDJ also brings a number of claims under state and local false claims statutes. Pursuant to 28 U.S.C. § 1367, federal courts may exercise supplemental jurisdiction "to hear state law claims that are so related to federal question claims brought in the same action as to 'form part of the same case or controversy under Article III of the United States Constitution.'" Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 308 (2d Cir. 2004) (quoting 28 U.S.C. § 1367(a)). However, a district court "may decline to exercise supplemental jurisdiction over a claim [if] . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Having dismissed JDJ's claims under the FCA, the Court declines to exercise supplemental jurisdiction over JDJ's state law claims.

CONCLUSION

Defendants' motion to dismiss (Dkt. 49) is GRANTED. The Clerk of the Court is directed to enter judgment for defendants and close the case.

SO ORDERED.


_____
P. Kevin Castel
United States District Judge


Dated:  New York, New York
        September 29, 2017

- 23 -